Filed 8/18/22  In re L.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078564 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J276822 & J276823) |
| v. | OPINION |
| M.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

1

In July 2018 defendant and appellant M.R. (Mother) had three minor children: S.R.[1] (female, born March 2001); D.R. (male, born Sept. 2012) and L.R. (male, born March 2015; collectively, the Children). M.F. (Father)[2] is the father of D.R. and L.R. (collectively, Brothers). On appeal, Mother contends that the juvenile court's findings and orders at the Welfare and Institutions Code section 366.26 hearing terminating her parental rights to Brothers must be reversed. For the reasons set forth *post*, we affirm.

**FACTUAL AND PROCEDURAL HISTORY[3]**

On July 3, 2018, San Bernardino County Children and Family Services (CFS) responded to an immediate referral. Law enforcement had responded to the home regarding possible elder abuse resulting in the death of maternal grandfather (MGF). Law enforcement found MGF in a malnourished state; he had not eaten in several days, had multiple bedsores, and had infections on his backside. MGF was in a vegetative state and had been lying in his own feces. Moreover, "[f]ire and ambulance personnel reported when they initially responded to the home there was a lot of drug paraphernalia in the home. Law enforcement located one meth pipe. . . . There were dirty diapers lying in the hallway. The home reeked of cigarettes and feces"

---

**1** S.R. turned 18 in March 2019; she is not a party to this appeal. S.E. is the alleged father of S.R.; he is also not a party to this appeal.

**2** Father is not a party to this appeal.

**3** On April 2, 2021, Mother filed a Notice of Intent to File Writ Petition, case No. E076829. On May 10, 2021, we dismissed the writ petition for failure to file a timely writ petition. On April 26, 2021, we ordered the record from case No. E076829 incorporated with this appeal.

On the same day, a social worker met with Mother and the Children. Mother stated that she lived with MGF, her boyfriend, and the Children. Mother stated that MGF had been receiving senior care services with a caretaker coming to their home twice a week to bathe him. However, they lost his retirement check and were unable to pay for the service. Mother reported that she had been telling MGF for some time that the level of care he required was beyond what she could do. He, however, refused to seek medical treatment. Mother claimed that she called an emergency room and she was told that she could not force him to go to the hospital if he refused to go. When the social worker asked Mother which emergency room she called, she said she found the phone number on the Internet.

Mother denied any knowledge of how a methamphetamine pipe came to be in her room. She also claimed that any razor blades found in her home were "not to chop up drugs" but rather for their flooring business. In August of 2016, Mother was arrested for possession of a controlled substance. After Mother's mother died in 2015, she had to "stop her bullshit partying" and be there for her children and MGF. Mother stated that MGF fell a lot and got red spots. Moreover, he had been refusing to eat in the last few days. When MGF could not move his legs, they called paramedics.

S.R. told the social worker that MGF took a long time to eat and had not been eating the past two weeks. She also said that MGF fell a lot and became anxious when asked if he wanted to go to the hospital. She denied any knowledge of drug use in the house.

3

The social worker noted that the home was messy with piles of belongings everywhere; knives often associated with drug use were found throughout the home; and the home smelled like cigarettes and urine. Deputies found a bong with water in it, and methamphetamine residue under the bathroom sink in the master bedroom. Deputies also saw methamphetamine in a cabinet drawer that was within reach of the Children. Mother's boyfriend stated that he believed the drug paraphernalia may have come from his storage unit; he was moving items over and he previously used drugs.

On July 6, 2018, CFS filed Welfare and Institutions Code section 300[4] petitions on behalf of the Children based on their parents' substance abuse problems. At the July 9, 2018, detention hearing, the juvenile court found a prima facie case for detaining the Children and ordered the parents to drug test.

On August 2, 2018, CFS filed a Jurisdictional/Dispositional Report for a hearing set for August 6, 2018. In the report, the social worker reported that S.R. was placed in one foster home, and Brothers were placed together in a different foster home. CFS noted that Mother missed her court-ordered drug test. Mother claimed that the drug-testing center did not have her information in their system.

The report noted that a social worker interviewed D.R. on July 19, 2018. D.R. stated that Mother smoked cigarettes, but denied seeing her smoke from a pipe or a glass. D.R. stated that Mother told him not to tell CFS or law enforcement "about the hitting

---

[4] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

4

and drugs." He then refused to speak any further about what happened at the home and said "the monster will come and get him."

On July 24, 2018, the social worker spoke with S.R., who stated she and her siblings should have been allowed to return home once the police decided not to arrest Mother. S.R. denied drug usage in the home, and stated that any drug paraphernalia probably belonged to Mother's boyfriend.

The social worker attempted to contact Mother and refer her to services numerous times. When Mother finally returned the social worker's call, Mother stated that she had been working and was unable to call sooner. Mother then canceled their scheduled appointment in a voicemail message. After that, the social worker had difficulties reaching Mother. On July 25, 2018, the social worker attempted to make an unannounced visit to the home. However, no one answered the door although there were several vehicles parked at the home.

On July 26, 2018, Mother met with the social worker. Mother denied having methamphetamine pipes in the home. She claimed that the pipes were for marijuana. Mother had a lengthy criminal history involving substance abuse, dating back from 2008 to 2016. Mother claimed that she took rehabilitation classes. Mother also stated that she previously had used methamphetamine by smoking, but she had been clean for approximately three years. Mother then admitted to relapsing about four months ago; she did not like it. Mother stated that she had been clean since her mother died because she no longer had support for the Children.

In an additional information report filed on October 9, 2018, CFS reported that Mother had missed six random drug tests. Moreover, the social worker attempted to contact Mother on five occasions between August and September of 2018. On August 23, 2018, Mother had a visit with the Children with no concerns; she appeared engaged with them. On September 24, 2018, Mother enrolled in an outpatient substance abuse program and tested positive for methamphetamine.

On October 10, 2018, the juvenile court sustained the section 300 petitions and ordered reunification services be provided to all three parents.

On April 2, 2019, CFS filed a status review report for the six-month review hearing set for April 10, 2019. In the report, CFS recommended that Brothers remain in their placement and services continue to be provided to the parents. Mother continued to struggle with substance abuse. She had been terminated from her outpatient substance abuse program for non-attendance. On March 25, 2019, Mother reentered the outpatient substance program and tested negative on intake. Mother failed to attend eight random drug tests from October 2018 through January 2019, and another in March 2019. On March 15, 2019, Mother tested positive for amphetamines. Mother was referred for counseling services in August 2018. However, she failed to attend the intake appointment. Mother was referred for counseling services again in March 2019; an intake meeting was to be scheduled.

Mother regularly attended the supervised visits with Brothers one time per week for two hours. Mother wanted more visits with Brothers, but understood that she needed to show progress in services to obtain more visits. Brothers were excited for the visits

and enjoyed their time together. They were also sad when Mother did not visit them. Brothers also had visits with S.R.; she transitioned to extended foster care and was residing with Mother.

CFS reported that the foster parents were actively involved in Brothers' well-being and appeared bonded with them. The foster parents were open to providing long-term care for Brothers. Brothers reported that they were happy in the home, but wanted to return to Mother's care. At the April 10, 2019, six-month review hearing, the juvenile court ordered an additional six months of reunification services.

On August 20, 2019, CFS filed its status review report for the 12-month review hearing. In the report, CFS recommended that the court terminate reunification services and order foster care as the permanent plan with a goal of legal guardianship for Brothers.

Father and Mother moved to Victorville to participate in the service plan to reunify with the Children. They were unemployed and used public transportation. CFS noted that Mother had a "pattern of jumping into services prior to the court hearing, while doing close to nothing at all other times and father is following this pattern." Notwithstanding, the parents consistently visited Brothers. The foster parents supervised the visits; the visits were going well.

At the August 22, 2019, contested 12-month review hearing, the parents testified. The court found that the parents had made minimal progress on their case plans. The court then terminated reunification services. The court found that it was not in Brothers' best interest to schedule a section 366.26 hearing since Brothers were not in a concurrent planning home. The court ordered a permanent plan of adoption for Brothers.

7

In October of 2018, Brothers were removed from their foster parents' care due to inappropriate discipline allegations of pinching L.R.

On October 3, 2019, Brothers were placed in the foster home of Ms. R. Although Ms. R. initially struggled with Brothers' behavioral issues at home and at school, Brothers were adjusting well in her home and were bonded with Ms. R.

By December 18, 2019, Mother had completed an outpatient substance abuse program; and classes on anger management, parenting education, and life skills. Mother also tested negative for drugs in the months of October and December 2019, while she was participating in the outpatient program. Moreover, although she failed to show up for a drug test on January 16, 2020, she tested negative on January 22, 2020. Mother reported that she attended AA/NA on a weekly basis.

Mother was given unsupervised visits one time per week for two hours. Moreover, the juvenile court authorized CFS to liberalize Mother's visits if she tested negative for 60 days. Upon county counsel's recommendation that the visits should be supervised due to safety concerns, the social worker changed visits back to supervised visits. The social worker also set up on-demand drug tests for Mother to demonstrate sobriety. The social worker verified that there were no safety concerns at Mother's home.

On February 21, 2020, the juvenile court authorized CFS to allow Mother to have unsupervised visits by approval packet.

On July 30, 2020, CFS filed a status review report for a section 366.3 review scheduled for August 21, 2020. CFS reported that Brothers continued residing with Ms. R., who actively advocated for Brothers by helping them meet their mental and emotional needs. Ms. R. stated that she would like to be a permanent and stable home for Brothers once their behaviors stabilized. Mother actively visited with Brothers via video calls. Although the visits were reported to go well, Ms. R., who supervised the visits, expressed some concerns to the social worker. Ms. R. noted that Mother told Brothers that she was working hard with an attorney to get them back, and that they should be going home soon. The social worker discussed the issue with Mother and explained the rules of visitation. Mother wanted in-person visits but Ms. R. did not feel comfortable leaving the home due to Covid.

On August 20, 2020, Mother filed a section 388 petition requesting return of Brothers to her care, unsupervised and increased visits, including overnight and weekend visits. Mother contended that she completed five months of outpatient substance abuse treatment, and that she was randomly drug testing at least twice per month, and testing negative. Mother claimed to be sober since September 2, 2019. Mother also completed parenting education, life skills, and self-care programs, and an anger management course. Additionally, Mother was ~~also~~ attending virtual counseling. Mother believed that the proposed changes were in Brothers' best interests because they were bonded to her, and they would benefit emotionally from being parented by Mother on a daily basis, and/or having extended visits with Mother.

9

On August 21, 2020, the juvenile court granted a hearing on Mother's section 388 petition, and ordered CFS to file a response to the petition. At a hearing on the postpermanency review hearing on the same day, the court continued Brothers in Ms. R.'s home, and continued supervised visitation one time per week for two hours.

In CFS's response to Mother's petition, CFS recommended that Brothers reside out of the home and that family reunification services be provided to Mother. CFS noted that visits between Brothers and Mother had been appropriate, and there were no negative reports. Visits had been by video during Covid, and Mother continued to tell Brothers she was working on bringing them home. When the social worker informed Mother that this was inappropriate, Mother responded well.

The social worker reported that she spoke with S.R. on August 27, 2020, and she expressed concerns regarding Brothers being allowed to return to Mother's care. S.R. stated that she returned to Mother's home on March 14, 2019, and that she was at the home for two months when she realized that Mother had not made any positive changes. S.R. stated that the home was always dirty, and there was never any food in the home. S.R. stayed with Mother during the week to attend school, and the foster parents picked her up on the weekends and would take S.R. food. She also reported that Mother's boyfriend made her feel uncomfortable. S.R. called law enforcement during a domestic violence incident when the boyfriend was beating on Mother. Mother allowed the boyfriend to move back after a restraining order was issued upon his release from jail. S.R. did not believe her siblings would be safe in Mother's care. Mother stated that she

had an estranged relationship with S.R., and that they had not spoken since May 2019. Mother did not understand S.R.'s concerns.

On September 22, 2020, the social worker spoke with Mother. Mother stated that she was living by herself and was working part time at a construction agency. She admitted that she had a domestic violence incident with her boyfriend in March 2019, but he had not been in the home since. She asked him to pick up his belongings in January 2020. The social worker verified with law enforcement that they did not have any calls to Mother's home within the past year.

On September 29, 2020, the juvenile court granted Mother an additional six months of reunification services.

On March 12, 2021, CFS filed a status review report for the March 26, 2021, section 366.3 postpermanent plan review hearing. In the report, CFS recommended that Brothers remain in Ms. R.'s home, and that Mother's reunification services be terminated. CFS also recommended that a section 366.26 haring be set to establish a permanent plan of legal guardianship for Brothers.

The social worker reported that on October 21, 2020, Mother tested positive for amphetamines. A confirmation test confirmed that Mother tested positive for methamphetamine. Mother failed to drug test on numerous occasions between October 2020 and February 2021, and the social worker could not confirm Mother's sobriety. Mother stated that she had not tested due to Covid; she did not want to contract the virus. Notably, Mother never expressed her concerns for contracting Covid prior to the end of February 2021.

11

The social worker also stated that during the past few months, she had difficulty contacting Mother to discuss her services and failure to drug test; Mother failed to return the social worker's phone calls. Mother also missed several therapy sessions and domestic violence classes during the past several months. The social worker noted that Mother had recently completed a counseling session on January 21, 2021. Mother, however, failed to complete her domestic violence classes because the referred services had expired.

Mother continued to visit Brothers, and the visits were positive. Brothers had adjusted well to living in Ms. R.'s home and reported feeling happy and safe. Ms. R. stated that she would like to be considered for legal guardianship for Brothers.

On March 26, 2021, the juvenile court terminated Mother's reunification services and set a section 366.26 hearing. The court also ordered supervised visits for one time per month for two hours.

On July 1, 2021, CFS filed a section 366.26 report. CFS recommended that the section 366.26 hearing be continued for 90 days to allow time for the permanent plan of adoption to be implemented. Brothers' caregivers, Ms. R. and Mr. B., were interested in adopting Brothers. Brothers were happy and safe in their care. When asked about adoption, D.R. stated that he was okay with it because his caregivers cared for him. He stated, "it's my mom's fault we are here anyway." L.R. stated that he liked his prospective adoptive home and would like to live there until he grew up.

Brothers continued to visit the parents once a month; they interacted in a positive manner. D.R., however, struggled with being able to regulate his emotions. He often became angry and depressed after visits. D.R. destroyed property in his caregivers' home, and his treatment team believed that the continued interaction with his parents was not allowing his behaviors to stabilize because he still believed he was going back home with Mother. D.R. would be receptive in the home throughout the month, but his negative behaviors emerged after visits. L.R. was younger and had a strong bond with his caregivers.

On July 26, 2021, the juvenile court continued the section 366.26 hearing at CFS's request. In September 2021, based upon a request from Brothers' psychiatrist, Brothers were placed on psychotropic medications for ADHD, ODD, and anxiety.

On October 6, 2021, CFS filed a section 366.26 report. CFS recommended that parental rights be terminated and a permanent plan of adoption be implemented. Overall, D.R.'s behavioral issues had improved with some concerns, but the attachment between D.R. and Ms. R. grew stronger, and he viewed Ms. R. as the biggest advocate in his life. While D.R. had tested Ms. R. numerous times in the past two years, he found that Ms. R. loved him and would stand by him despite his actions. D.R. stated that he wanted to be adopted. He said Ms. R. "loves me and my brother, treats us good, and loves us. We love her." L.R. continued to express his desire to be adopted by Ms. R. and Mr. B.

Both Mother and Father continued to attend monthly visits with Brothers, and they were described as appropriate. Brothers were happy to see them and did well when the visits ended.

At the February 22, 2022, section 366.26 hearing, Mother testified that she disagreed with CFS's recommendation to terminate her parental rights. Mother stated that she consistently visited Brothers once a month for two hours, and there had never been any issues. During her visits with the boys, they would eat and discuss what was new, and what Brothers were doing in school. Brothers would tell her what they were watching on television, and what games they like to play. After eating, they would play card games or go outside and play. Mother believed that they were happy during visits, and they were all engaged in activities together.

Mother also testified that at the beginning of visits, Brothers told her that they missed and loved her. Mother stated that Brothers would tell her they wanted to come home and would ask when they would be able to move back home. After visits, Mother said that she would be upset and sad because Brothers were not with her. She believed that they felt sad as well, and that they had a hard time coping being away from her. Mother contended that it would be harmful to Brothers if she could no longer see them because they love her and still ask her when they are coming home.

After hearing arguments, the juvenile court applied the factors under *In re Caden C.* (2021) 11 Cal.4th 614 to determine whether the parental benefit exception applied. The court found that the parents consistently visited Brothers, and noted that the visits were generally described to go well, and that Brothers were happy to see their parents. As to the issue of such a positive emotional attachment that Brothers would benefit from continuing the relationship, the court was not persuaded. The court noted that Brothers had been out of Mother's care for over two and a half years, and that Brothers were

14

bonded to the caregivers and excited about being adopted. The juvenile court also noted that Brothers did well saying their good-byes after visits with Mother; there was nothing to show that Brothers were upset when the visits ended. Therefore, the court found that no exceptions to adoption applied and terminated parental rights.

On February 22, 2022, Mother filed a timely notice of appeal.

## DISCUSSION

Mother contends that "the juvenile court erred when it found that the parental benefit exception to adoption did not apply and refused to implement a lesser permanent plan instead of terminating Mother's parental rights." We find the juvenile court properly found that the parental benefit exception to adoption did not apply.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the child. If a child cannot be returned to his or her parents and is likely to be adopted if parental rights are terminated, a court must select adoption as the permanent plan unless one of the exceptions provided in section 366.26, subdivision (c) applies. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 946; *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

In order to invoke an exception under section 366.26, subdivision (c)(1)(B)(i), "the moving parent must establish, by a preponderance of the evidence, each of the following elements: (1) that the parent has regularly visited with the child; (2) that the child would benefit from continuing the relationship; and (3) that terminating the relationship would be detrimental to the child." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).) This exception "to the general rule that the court must choose adoption

15

where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

We review the juvenile court's findings on the first two elements under the substantial standard of review. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206 (*L.A.-O.*).) "But 'the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his  parent—is discretionary and properly reviewed for abuse of discretion.' " (*Id.*, at p. 206, quoting *Caden C.*, *supra*, 11 Cal.App.5th at p. 639.)  " 'A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " ' " (*L.A.-O.*, at pp. 206-207, quoting *Caden C.*, at p. 641.)

In this case, the juvenile court analyzed the parental benefit exception under *Caden C.*, *supra*, 11 Cal.5th 614.  The court stated: "The issue then is whether there are any exceptions that apply.  And I [do] agree with the recent citation of Caden C. provided by all counsel today.  [¶]  I'll note that the law is clear that once services are terminated, that the focus shifts to the needs of the child for both permanency and stability.  Adoption is the preferred plan and should be ordered, unless there are exceptional circumstances."

The court went on to state: "The exceptional circumstances being argued today is the parental bond exception; and that has been argued under Caden C.  In order for a parent to meet that exception, they must show regular visitation.  They must show that the child has a substantial positive, emotional attachment to the parents, the kind that would benefit from continuing that relationship.  And finally, they must show that

16

terminating the attachment will be detrimental to the child, even when balanced against the stability of a permanent home."

As to the first prong, there is no doubt that "the parents have had consistent visits and that's described in the report. And the visits are generally described to go well. And the children are reported to be happy to see the parents.

The court then stated, "[t]he issue for the Court is whether or not that constitutes such a positive emotional attachment, the kind that would imply that the child would benefit from the relationship. [¶] There's no doubt that based on mother's testimony from her end, the children have that type of relationship, but the issue is from the children's eyes. [¶] I'll note that counsel has argued in the report the children have now been out of care for over two and a half years quickly approaching three years, which is the vast majority over half of [L.R.'s] life and a strong majority of [D.R.'s] life. [¶] I'll note that they're described to be bonded to the caregivers; but *most importantly* to the Court, when either was asked about permanency they were excited about the prospect of adoption. [¶] . . . the children indicated they wish to be adopted, that Ms. R. loved the[m], that they are treated well, and [they] love her. [¶] . . . the boys would like to stay in the home until adulthood. And they reported they feel safe and happy."

Thereafter, the court addressed the third prong of *Caden C.* The court stated: "There's no evidence that it would be detrimental for the children to terminate parental rights when balanced against the stability of an adoptive home. We're talking about nine plus years of stability for [D.R.] And 12 plus years of stability for [L.R.]. So even if there was some residual benefits as far as—excuse me—detriment that's far outweighed

17

by the benefits of the stability of adoption in a home where have been thriving at now for over two and a half years."

The court then concluded: "So based on that, I can't find that the parents have provided evidence to support the exception; and find that no exception applies."

We agree with the juvenile court's reasoning and findings. Even if we could find that there was some benefit to maintaining the relationship between Mother and Brothers, we find that there would be no detriment to Brothers with the termination of their relationship with Mother. This court recently explained that " 'in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]' [Citation.] The court must ask, 'does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' " (*L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.)

Here, the juvenile court did just that. There is no evidence that severing the relationship between Mother and Brothers would be detrimental to Brothers. Brothers have been removed from Mother's care for over two and a half years. During this time, Mother visited with Brothers regularly, as permitted, and the visits went well. Mother, therefore, contends that there was evidence of a significant parent-child relationship despite the lack of daily contact and Brothers' positive bond with their caretakers.

18

" 'Yet the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with [their] natural parent. (*In re Dakota H.*[ (2005)] 132 Cal.App.4th [212,] 229 [a parent must demonstrate something 'more than frequent and loving contact, an emotional bond with the child, or pleasant visits']; *In re Angel B. (*2002) 08 Cal.App.4th 454, 458 ['for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt'].)" (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 316.)

Here, Mother has been unable to show that her relationship with Brothers was compelling enough to forego adoption. Instead, the evidence showed that although the visits went well and were regular, the visits were always supervised and never progressed to unsupervised, overnight or weekend visits. Although Mother stated that she was upset after visits with Brothers, and she *believed* they felt the same way, the court noted that Brothers did well when the visits ended, and there was nothing evidencing that the Children were upset after visits or asked to visit with Mother at other times. Moreover, both brothers stated they wanted to be adopted by their caregivers and to live with them until adulthood.

Nonetheless, Mother argues that Brothers would suffer harm because of D.R.'s behavioral issues after his visits with Mother. However, Mother had created the issues with Brothers by telling them on numerous occasions that she was working hard to get them back and they should be coming home soon with her. Although Mother argues that D.R. was displaying "separation anxiety" from Mother, there is nothing in the record to

indicate that he suffered from separation anxiety. Instead, D.R.'s treatment team believed that the continued interaction of D.R. with his parents did not allow his behavior to stabilize because he believed he would be going back home with Mother. However, after spending more time with his caregivers, D.R.'s issues improved and he bonded more with them. D.R. expressed his desire to be adopted. Contrary to Mother's argument, the evidence showed that Brothers, who had resided with Ms. R. and Mr. B for over approximately two years by the time of the section 366.26 hearing, reported that they were attached to their caregivers. D.R. stated that he viewed Ms. R. as his biggest advocate, and that she loved him even although he had tested her during the past two years.

Indeed, Mother has failed to present evidence that her relationship with Brothers was more than an "incidental benefit" from positive interactions with Mother, particularly when weighed against the benefit of a permanent home. The exception requires the existence " ' "of a substantial, positive emotional attachment" ' between parent and child." (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 319.) There was no evidence that Brothers had a substantial, positive emotional attachment to Mother.

Hence, there is no evidence that Brothers would be "greatly harmed" by the termination of their natural parent-child relationship with Mother. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) Therefore, we conclude Mother has failed to show that the juvenile court's findings lack the support of substantial evidence or that its exercise of discretion rested on an unsupported factual basis. In short, the court properly found the parent-child relationship exception to adoption did not apply.

20

## DISPOSITION

We affirm the findings and orders of the juvenile court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                               
                                    J.

We concur:

RAMIREZ                    
                P. J.

FIELDS                  
              J.

21